COURT OF APPEALS

                                         SECOND
DISTRICT OF TEXAS

                                                      FORT
WORTH

 

 

                                          NO.
02-08-179-CV

 

 

IN THE INTEREST OF J.L.W.                                                                   

                                                                                                           

 

                                                  ------------

 

             FROM THE 323RD
DISTRICT COURT OF TARRANT COUNTY

 

                                                  ------------

 

                                  MEMORANDUM OPINION[1]

 

                                                  ------------

I. Introduction

In two issues, Appellant Diane R. (hereinafter AMother@)
appeals the termination of her parental rights to J.L.W.  We affirm.

II. Factual and Procedural History








J.L.W., a mentally‑retarded special needs
child, was born to Mother in 2003.[2]  Mother has four children: B., a ten-year-old
girl; A., a nine-year-old girl; J.L.W., a four-year-old boy; and D., a
three-year-old girl.  A., B., and J.L.W.
each have different fathers.  Mother does
not have legal custody of any of her children.

Prior to J.L.W.=s
removal, Mother, who is also mentally retarded,[3]
already had a significant history with Child Protective Services (CPS)
involving abuse directed at her and her older daughters, A. and B., by Mother=s
boyfriends. J.L.W.=s alleged biological father,
J.J.W., was convicted of assaulting Mother in 2003,[4]
and A.=s father
beat both B. and Mother.








CPS=s first
referral involving J.L.W. occurred in October 2004, but the events that
directly led to the termination of Mother=s
parental rights to J.L.W. occurred in March 2007.  CPS had already begun an investigation of negligent
supervision and physical abuse when it received information about an attack on
Mother by her live-in boyfriend, P.J.[5]

Fort Worth Police Officer Eric Stahura testified
about an assault by P.J. on Mother on March 23, 2007, and a second assault the
following day.  He testified that Mother
called the police on March 24, told them that she had been assaulted the night
before, and told them Athat she wanted to go to her
apartment and get her belongings and her child.@  She informed the police that she and P.J. had
gotten into an argument when he accused her of cheating on him and that he
choked her until she became unconscious. 
When she regained consciousness, she bolted, leaving J.L.W. alone with
P.J.  Officer Stahura testified that
Mother said that she did not want to press charges but that she needed an
escort because she was scared of P.J.








Mother gave substantially the same
testimony.  She testified, AI went
unconscious and I woke up and my baby [J.L.W.] was standing over me.@  She admitted that she left him with P.J.  She stated that she knew that was a mistake: AI wasn=t
thinking aboutCI wasCwhen I
came to, I said, let me hurry up and get out of here, and I started thinking I
should have turned back around and went and got my baby and took my baby with
me.@  She left the apartment around 5:00 p.m., did
not call P.J. because she Awas
scared that he would know where [she] was,@ and did
not contact the police until noon the next day.

Officer Stahura returned with Mother to her
apartment.  Mother=s aunt
(hereinafter AAunt@) met
them there to help Mother.  P.J.=s sister
had J.L.W. and brought him to the apartment. 
Officer Stahura stated:

While I was talking to
[P.J.=s sister], another
vehicle drove up behind me and [P.J.] got out of the vehicle and ran into the
apartment and went inside and locked the door. . . . I knocked on the door and
I heard the voice of a young girl that was thereCI believe it was [Mother=s] daughter. . . . She
unlocked the door.  I ran into the
apartment and ran to the back bedroom where I observed [P.J.] laying down on
top of [Mother] on top of the bed, holding her arms and shaking her and
screaming at her. . . . 

 

I believed it was a dangerous environment.  I had to pull him off of her, and I grabbed
him and pushed him against the wall and told him to calm down, and then, as I
went to escort him out of the room, he tried pulling away from me and going
back towards her, towards [Mother], and from there, I tried to take control of
him.  I tried to do an arm-bar take-down
to take him down to the ground.  It didn=t
work.  We struggled for a little
bit.  If I remember, he pushed me, and I
was eventually able to take him down on the ground and we struggled on the
ground until I was able to take him in custody.








Officer Stahura testified that he talked with
Mother after the assault and that she stated that she did not want to do
anything about it.  Officer Stahura
testified that he arrested P.J. because he had witnessed the assault. 

Mother and P.J. attempted to evade CPS after the
assault, forcing the caseworker to turn the case over to a private
investigation firm to locate the family. 
After Mother was located, CPS discovered that she had decided not to
file for a restraining order against P.J. or to press charges for assault; her
caseworker advised her that because of the domestic violence, P.J. needed to
move out of the house for J.L.W.=s
protection.[6]  James Templeton, Mother=s
caseworker at the time, testified that Mother cooperated with CPS in placing
J.L.W. with Aunt.  Two of Mother=s
daughters, A. and B., have lived with Aunt since they were one and two years
old respectively. 








Templeton, a retired police officer, stated that
his concern was that J.L.W. would not understand what was going on in a
domestic violence situation and could very easily get hurt in an altercation
between Mother and P.J.  Subsequent
caseworkers and Aunt testified that they had the same concerns.  P.J. had also previously admitted to
Templeton that he occasionally used marihuana; Templeton testified that this
raised concerns about J.L.W. being left unsupervised with someone who was
incapacitated.

Mother continued to live with P.J.  Although CPS referred Mother to domestic
violence counseling and individual therapy, Mother never went.  One of her CPS caseworkers testified, 

I asked her if she had contacted MHMR and APS and
continued those services.  She said she
had not.  I asked her why.  She said she didn=t know;
she just hadn=t.  And I asked her when the last time was when
she saw [P.J.].  She paused, and then she
said she still talks to him, she=s going
to continue to talk to him, and I informed her that due to the reason why
[J.L.W.] came into care that that was not a good situation for [J.L.W.] to
return to, and that as long as she was continuing to have that contact with
[P.J.], I was not recommending that [J.L.W.] go back to her home, and I asked her
if she would agree that [P.J.] would have no contact with [J.L.W.], and she
agreed at the time that she would not allow [P.J.] to have any contact with
[J.L.W.]








Mother resisted ending her relationship with
P.J.  In response to one caseworker=s
explanation that CPS could not return J.L.W. to her while P.J. lived with her,
Mother stated that P.J. was her boyfriend and they were together and they were
going to be together.  She stated that
all marriages had issues, all people fight, and that her situation with P.J.
was something that was normal.  Mother
testified that she and P.J. planned to get married and that she wanted to stay
with him and work the relationship out. 
She admitted that they had had physical fights in the past, but she
stated that she had never given any thought to leaving him at any point.  She testified that she lost her housing in
2005 because P.J. was living with her.

Mother had four visits with J.L.W. before June
2007, but she only visited J.L.W. once between June 2007 and February 2008,
after the visits were moved from the CPS office to Aunt=s
house.  Mother testified that she did not
visit him during that time because she did not want to go to Aunt=s house
and because she had to work.  After June
2007 and prior to March 2008, Mother made no effort to visit J.L.W. or to work
on her service plan, complaining that she had no transportation.  When CPS performed a home visit in 2008,
Mother did not have anything set up for J.L.W. 
The CPS caseworker testified as follows:

Q.     Did
you ask the mother about that?

 

A.     I
did.

 

Q.     And
what did she tell you?

 

A.     She
statedCI asked where was
[J.L.W.] going to be sleeping.  She
showed me her bedroom, and she stated that she and [J.L.W.] would have the bed,
and then I asked her, I said, well, where is [P.J.] going to sleep?  And she stated to me [that] he would also be
sleeping in the bed until they could get a toddler bed; she was trying to find
a toddler bed, but she couldn=t find one at this time, but until the toddler
bed was purchased, the three of them would be sleeping in the bed together.

 

Q.     Is
that appropriate?








A.     No.

 

Q.     Did
you talk to her about [P.J.] being around the child?

 

A.     I
did.

 

Q.     And
what did she tell you?

 

A.     She stated to me that [P.J.] loves her
child, loves [J.L.W.], and would not hurt [J.L.W.].  I asked her, putting that aside, if something
were to happen, and she said she would take [J.L.W.] to work with her and if
she felt like she could protect [J.L.W.], if she needed to take him to work,[7]
that=s what
she would have to do; otherwise, she was going to be there, and she felt like
she could protect him.

The CPS caseworker testified that J.L.W. was
doing really well living with Aunt, and she recommended that Mother=s
parental rights be terminated so that Aunt could adopt J.L.W.








Aunt testified that she and her husband want to
adopt J.L.W.  She testified that she did
not think that Mother had the ability to care for J.L.W. and that it would be
dangerous for J.L.W. to be returned to Mother. 
She testified that she had custody of two of Mother=s other
children, A. and B., A[b]ecause of Mother=s poor
choice of boyfriends.@ 
She explained that A.=s father
abused B. and beat her unconscious twice before B. was two years old, that A.=s father
beat Mother, and that Mother was not able to protect B.  She stated, ATo my
knowing, all of [Mother=s] boyfriends ha[ve] been
abusive to her,@ and stated that this caused her
concern for J.L.W.=s welfare.

Aunt also testified that she saw Mother hit B.
with a comb when Mother was combing B.=s hair
and B wouldn=t sit still, Aso
[Mother] hit her in the head@ with
the comb.  She testified that when A. and
B. lived with Mother, Mother neglected them: ADirty
clothes, hair wasn=t combed, and she would leave
them there with this boy, with this man.@  Aunt stated that she had concerns about
Mother leaving her children with various people.

Mother testified that if J.L.W. could not be
returned to her, then she would want Aunt to take care of him.

The trial court terminated Mother=s
parental rights, finding by clear and convincing evidence that she knowingly
placed or knowingly allowed J.L.W. to remain in conditions or surroundings that
endangered the child=s physical or emotional
well-being; that she engaged in conduct or knowingly placed J.L.W. with persons
who engaged in conduct that endangered the child=s
physical or emotional well-being; and that termination of Mother=s
parental rights to J.L.W. was in the child=s best
interest.  See Tex. Fam. Code Ann.
'' 161.001(1)(D),
(E), 161.001(2) (Vernon Supp. 2008). 
This appeal followed.

III. Legal and Factual Sufficiency








In her first issue, Mother complains that the
evidence is legally and factually insufficient to support the trial court=s
findings under subsections (D) and (E) of section 161.001(1) of the family
code.  In her second issue, she argues
that the evidence is legally and factually insufficient to support the trial
court=s
finding that termination of her parental rights was in the child=s best
interest under section 161.001(2) of the family code.

A. Standard of Review








A parent=s rights
to Athe
companionship, care, custody, and management@ of her
child are constitutional interests Afar more
precious than any property right.@  Santosky v. Kramer, 455 U.S. 745, 758B59, 102
S. Ct. 1388, 1397 (1982); In re M.S., 115 S.W.3d 534, 547 (Tex.
2003).  AWhile
parental rights are of constitutional magnitude, they are not absolute.  Just as it is imperative for courts to
recognize the constitutional underpinnings of the parent-child relationship, it
is also essential that emotional and physical interests of the child not be
sacrificed merely to preserve that right.@  In re C.H., 89 S.W.3d 17, 26 (Tex.
2002).  In a termination case, the State
seeks not just to limit parental rights but to end them permanentlyCto
divest the parent and child of all legal rights, privileges, duties, and powers
normally existing between them, except for the child=s right
to inherit.  Tex. Fam. Code Ann. '
161.206(b) (Vernon Supp. 2008); Holick v. Smith, 685 S.W.2d 18, 20 (Tex.
1985).  We strictly scrutinize
termination proceedings and strictly construe involuntary termination statutes
in favor of the parent.  Holick,
685 S.W.2d at 20B21; In re E.M.N., 221
S.W.3d 815, 820 (Tex. App.CFort
Worth 2007, no pet.).

In proceedings to terminate the parent‑child
relationship brought under section 161.001 of the family code, the petitioner
must establish one ground listed under subdivision (1) of the statute and must
also prove that termination is in the best interest of the child.  Tex. Fam. Code Ann. ' 161.001;
In re J.L., 163 S.W.3d 79, 84 (Tex. 2005).  Both elements must be established;
termination may not be based solely on the best interest of the child as
determined by the trier of fact.  Tex.
Dep=t of Human Servs. v. Boyd, 727
S.W.2d 531, 533 (Tex. 1987).








Termination of parental rights is a drastic
remedy and is of such weight and gravity that due process requires the
petitioner to justify termination by clear and convincing evidence.  Tex. Fam. Code Ann. ''
161.001, 161.206(a); In re J.F.C., 96 S.W.3d 256, 263 (Tex. 2002).  This intermediate standard falls between the
preponderance standard of ordinary civil proceedings and the reasonable doubt
standard of criminal proceedings.  In
re G.M., 596 S.W.2d 846, 847 (Tex. 1980); In re C.S., 208 S.W.3d 77,
83 (Tex. App.CFort Worth 2006, pet.
denied).  It is defined as the Ameasure
or degree of proof that will produce in the mind of the trier of fact a firm
belief or conviction as to the truth of the allegations sought to be
established.@ 
Tex. Fam. Code Ann. ' 101.007
(Vernon 2002).

In reviewing the evidence for legal sufficiency
in parental termination cases, we must determine whether the evidence is such
that a factfinder could reasonably form a firm belief or conviction that the
grounds for termination were proven.  In
re J.P.B., 180 S.W.3d 570, 573 (Tex. 2005). 
We must review all the evidence in the light most favorable to the
finding and judgment.  Id.  This means that we must assume that the
factfinder resolved any disputed facts in favor of its finding if a reasonable
factfinder could have done so.  Id.  We must also disregard all evidence that a
reasonable factfinder could have disbelieved. 
Id.  We must consider,
however, undisputed evidence even if it is contrary to the finding.  Id. 
That is, we must consider evidence favorable to termination if a
reasonable factfinder could, and disregard contrary evidence unless a
reasonable factfinder could not.  Id.

We must therefore consider all of the evidence,
not just that which favors the judgment. 
Id.  But we cannot weigh
witness credibility issues that depend on the appearance and demeanor of the
witnesses, for that is the factfinder=s
province.  Id. at 573, 574.  And even when credibility issues appear in
the appellate record, we must defer to the factfinder=s determinations
as long as they are not unreasonable.  Id.
at 573.








In reviewing the evidence for factual
sufficiency, we must give due deference to the factfinder=s findings
and not supplant the judgment with our own. 
In re H.R.M., 209 S.W.3d 105, 108 (Tex. 2006).  We must determine whether, on the entire
record, a factfinder could reasonably form a firm conviction or belief that the
parent violated subsections (D) or (E) of section 161.001(1) and that the
termination of the parent=s parental rights would be in
the best interest of the child.  C.H.,
89 S.W.3d at 28. 

B. Endangerment Finding

In her first issue, Mother claims that the
evidence Adoes not show a pattern of
violence and abuse involving [her], nor does it show other patterns of [her]
conduct which would endanger the child=s
physical or emotional well‑being, such as continuous drug abuse,
homelessness, or emotional instability.@  Instead, she states that the evidence shows
that prior CPS referrals regarding J.L.W. were unfounded and only one physical
altercation occurred between her and her boyfriend, P.J. 








The trial court may order termination of the
parent‑child relationship if it finds by clear and convincing evidence
that the parent has knowingly placed or knowingly allowed the child to remain
in conditions or surroundings which endanger the physical or emotional well‑being
of the child.  Tex. Fam. Code Ann. ' 161.001(1)(D).  Endangerment is defined as exposing to loss
or injury, to jeopardize.  In re
J.T.G., 121 S.W.3d 117, 125 (Tex. App.CFort
Worth 2003, no pet.).  Under subsection
(D), it is necessary to examine evidence related to the environment of the
child to determine if the environment was the source of endangerment to the
child=s
physical or emotional well‑being. 
In re D.T., 34 S.W.3d 625, 632 (Tex. App.CFort
Worth 2000, pet. denied).  

To support a finding of endangerment, the parent=s
conduct does not necessarily have to be directed at the child nor is the child
required to suffer injury.  Boyd,
727 S.W.2d at 533.  Inappropriate,
abusive, or unlawful conduct by persons who live in the child=s home
or with whom the child is compelled to associate on a regular basis in his home
is a part of the Aconditions or surroundings@ of the
child=s home
under section 161.001(1)(D). 
Castorena v. Tex. Dep=t of
Protective & Regulatory Servs., No. 03‑02‑00653‑CV,
2004 WL 903906, at *8 (Tex. App.CAustin
Apr. 29, 2004, no pet.) (mem. op.); In re B.R., 822 S.W.2d 103, 106
(Tex. App.CTyler 1992, writ denied) (op. on
reh=g); see
also In re W.S., 899 S.W.2d 772, 776 (Tex. App.CFort
Worth 1995, no writ) (Aenvironment@ refers
not only to the acceptability of living conditions, but also to the parent=s
conduct in the home). 








The trial court may order termination of the
parent‑child relationship if it finds by clear and convincing evidence
that the parent has engaged in conduct or knowingly placed the child with
persons who engaged in conduct which endangers the physical or emotional well‑being
of the child.  Tex. Fam. Code Ann. '
161.001(1)(E).  Under subsection (E), the
relevant inquiry is whether evidence exists that the endangerment of the child=s
physical or emotional well‑being was the direct result of the parent=s
conduct, including acts, omissions, and failures to act.  J.T.G., 121 S.W.3d at 125.   Termination under subsection (E) must be
based on more than a single act or omission; a voluntary, deliberate, and
conscious course of conduct by the parent is required.  Id.; D.T., 34 S.W.3d at
634.  To determine whether termination is
necessary, courts may look to parental conduct occurring both before and after
the child=s birth.  In re D.M., 58 S.W.3d 801, 812 (Tex.
App.CFort
Worth 2001, no pet.).  The manner in
which a parent treats other children in the family can also be considered in
deciding whether that parent engaged in a course of conduct that endangered the
physical or emotional well‑being of a child.  Cervantes‑Peterson v. Tex. Dep=t of
Family & Protective Servs., 221 S.W.3d 244, 253 (Tex.
App.CHouston
[1st Dist.] 2006, no pet.).  The
factfinder may infer from past conduct endangering the child=s well‑being
that similar conduct will recur if the child is returned to the parent.  See In re D.L.N., 958 S.W.2d 934, 941
(Tex. App.CWaco 1997, pet. denied), disapproved
on other grounds by J.F.C., 96 S.W.3d at 256, and C.H., 89 S.W.3d at
17. 








Because the evidence pertaining to subsections
161.001(1)(D) and (E) is interrelated, we may conduct a consolidated
review.  In re M.C.T., 250 S.W.3d
161, 169 (Tex. App.CFort Worth 2008, no pet.); see
also In re M.R., 243 S.W.3d 807, 819 (Tex. App.CFort
Worth 2007, no pet.) (holding that there was legally and factually sufficient
evidence of both endangerment grounds when, among other things, the evidence
showed that the mother exposed her children to domestic violence and refused to
participate in her CPS service plan).

Mother relies on her own testimony that (1) her
last physical altercation with P.J. occurred when J.L.W. was first removed from
her and (2) that A.=s father never hit her to
support her argument that the State failed to establish a pattern of abuse or
violence that would result in endangerment to J.L.W.=s
physical or emotional well-being. 

Although Mother testified that P.J. had not
abused her since CPS removed J.L.W. and that A.=s father
never abused her, the trial court could have reasonably disbelieved this
testimony based on Aunt=s controverting testimony that
all of Mother=s boyfriends had abused her,
including A.=s father; the evidence also
showed J.L.W.=s father=s
conviction for assaulting Mother. 








Other evidence at trial established a pattern of
domestic abuse directed primarily at Mother, but also at her children, by
Mother=s
boyfriends.  It also established that
Mother was unable to recognize or acknowledge the danger to herself and her
children or to take any sort of action to protect the children:   she refused to press charges against P.J. for
either assault in March 2007, she abandoned J.L.W. in the apartment with P.J.
after the first attack, she attempted to hide J.L.W. from CPS after the
assault, and she failed to attend domestic violence counseling.  Instead, Mother testified that she planned to
marry P.J. and that she had never given any thought to leaving him.  And Aunt testified that Mother both failed to
protect and also neglected her other children.

The CPS caseworkers involved with J.L.W.=s case testified
that they were concerned that J.L.W., a delicate special needs child, could get
hurt; Mother refused to acknowledge this danger other than to state that she
would take J.L.W. to work with her if she needed to and that she felt like she
could protect him.  See In re
D.R., No. 02-06-00146-CV, 2007 WL 174351, at *1, 7 (Tex. App.CFort
Worth Jan. 25, 2007, no pet.) (mem. op.) (holding evidence of endangerment
legally and factually sufficient with regard to mother suffering from severe
mental retardation because A[t]he
parent need not know that his or her own conduct is dangerous for a termination
order pursuant to section 161.001(1)(E) to be proper@).  








Furthermore, Mother failed to make any efforts to
perform her service plan until a month before the termination trial, and she
did not visit J.L.W. for eight months, endangering his emotional
well-being.  Cf. D.T., 34 S.W.3d
at 640 (holding that the evidence of endangerment was not factually sufficient
when mother contacted the State in order to ensure her child=s safety
and complied as fully as possible with the goals required to facilitate reunification
with her child); Clay v. Tex. Dep=t of
Human Res., 748 S.W.2d 598, 600B01 (Tex.
App.CWaco
1988, no writ) (reversing termination on endangerment ground when mother
testified she was getting a divorce from her abusive husband and would not go
back to him, and she made regular visits, paid child support, and made every
effort to comply with the court and DHS=s
requirements); Doria v. Tex. Dep=t of
Human Res., 747 S.W.2d 953, 958B59 (Tex.
App.CCorpus
Christi 1988, no writ) (reversing termination where record indicated, among
other factors, that Adespite appellant=s low
intelligence, lack of skills, transportation problems and poverty[,]@ she
attended parental skill classes, worked two part‑time jobs, substantially
corrected the defects in the home, visited the children, and ended her
relationship with her abusive boyfriend).








Reviewing all of the evidence in the light most
favorable to the finding and judgment, and assuming that the trial court
resolved any disputed facts in favor of its finding if it could have reasonably
done so, we hold that the trial court could have reasonably formed a firm
belief or conviction that both Mother=s
conduct and her environment endangered J.L.W. 
See J.P.B., 180 S.W.3d at 573.  Therefore, we hold that the evidence is
legally sufficient to support both of the trial court=s
endangerment findings.  Likewise, giving
due deference to the trial court as factfinder, we hold that the evidence is
also factually sufficient to support both of the trial court=s
endangerment findings.[8]  We overrule Mother=s first
issue.

C. Best Interest Finding

Mother argues that although she continued a
relationship with P.J. and although the evidence may show that J.L.W. would
live a better life with the adoptive family, (1) the evidence presents no firm
facts supporting the finding that termination is in J.L.W.=s best
interest outside of her relationship with P.J., and (2) only scant evidence of
each relevant Holley factor exists in this case.













Prompt and permanent placement of the child in a
safe environment is presumed to be in the child=s best
interest.  Tex. Fam. Code Ann. '
263.307(a) (Vernon 2002).  There is also
a strong presumption that keeping a child with a parent is in the child=s best
interest.  In re R.R., 209 S.W.3d
112, 116 (Tex. 2006).  Nonexclusive
factors that the trier of fact in a termination case may use in determining the
best interest of the child include:  the
desires of the child; the child=s
emotional and physical needs now and in the future; the emotional and physical
danger to the child now and in the future; the parental abilities of the
individuals seeking custody; the programs available to assist these individuals
to promote the best interest of the child; the plans for the child by these
individuals or by the agency seeking custody; the stability of the home or
proposed placement; the acts or omissions of the parent which may indicate that
the existing parent‑child relationship is not a proper one; and any
excuse for the acts or omissions of the parent.  Holley v. Adams, 544 S.W.2d 367, 371B72 (Tex.
1976).  These factors are not exhaustive;
some listed factors may be inapplicable to some cases; other factors not on the
list may also be considered when appropriate. 
C.H., 89 S.W.3d at 27. 
Furthermore, undisputed evidence of just one factor may be sufficient in
a particular case to support a finding that termination is in the best interest
of the child.  Id.  On the other hand, the presence of scant
evidence relevant to each factor will not support such a finding.  Id.

We may also consider additional factors listed in
section 263.307 of the family code.  See
Tex. Fam. Code Ann. ' 263.307.  Relevant 
factors here include the following: the child=s age
and physical and mental vulnerabilities; whether there is a history of abusive
or assaultive conduct by the child=s family
or others who have access to the child=s home;
the willingness and ability of the child=s family
to effect positive environmental and personal changes within a reasonable
period of time; and whether the child=s family
demonstrates adequate parenting skills, including providing the child and other
children under the family=s care with protection from
repeated exposure to violence even though the violence may not be directed at
the child.  See id.

Mother testified that she was aware of her child=s
disability and would continue to provide him with proper services and schooling
if he were returned to her; that P.J. loves J.L.W. and that she plans to
continue her relationship with P.J.; that she had not been involved in any
violence or abuse since J.L.W.=s
removal; that she had obtained a stable living environment and stable
employment; and that she had support through MHMR and APS to help with her
disability and J.L.W.=s.








As a child with West Syndrome, J.L.W. has
significant physical and mental disabilities and will continue to have
them.  Based on the testimony at trial by
Aunt, Officer Stahura, and the CPS caseworkers, the trial court could have
found that to return J.L.W. to Mother (and to P.J. according to Mother=s
testimony) would risk J.L.W=s
emotional and physical well-being because of the couple=s past
history of domestic abuse, Mother=s
individual history of abusive relationships, Mother=s
failure to protect her other children from the men with whom she had had
abusive relationships, and Mother=s
inability to retain services or housing because of her continued relationship
with P.J.  Furthermore, the evidence at
trial revealed that Mother has been unable to care for any of her four
children, that Mother failed to attend domestic violence counseling, and that
Mother=s plan
for J.L.W. was to share her bed, which she already shared with P.J., with
J.L.W. until she could acquire a toddler bed for him.

In contrast, Aunt, already caretaker for two of
Mother=s four
children, took J.L.W. into her home and sought to adopt him.  The State=s plan
for J.L.W. was for Aunt to adopt him. 
When asked whether J.L.W. was bonded with Aunt and his other siblings in
Aunt=s home,
the CPS caseworker replied: 








Yes, he is, and the
reason that I say, when I first met [J.L.W.], he was at school, and I observed
his play, and he does not at school interact with the other children too
well.  You know, he=s not a problem, but he=s just a loner.  He wants to be by himself.  And I had observed that interaction for the
longest, and when I finally had an opportunity to get out to [Aunt=s] home and to see him
respond to her, he smiles, he knows her, he goes to her, he knows that he has
two sisters, he=s very well-attached to
the home, and has made great progress in the home.

 

Because of J.L.W.=s
special needs, one of the CPS caseworkers testified that it was very important
that Aunt be able to adopt J.L.W. so that J.L.W.=s
Medicaid would continue.  She testified, Abecause
it takes so much to care for [J.L.W.], that he is going to need the subsidy and
all that comes with that so that she can be able to continue to provide the
excellent care and give the services in her home to provide for [J.L.W.]@  Aunt receives no financial help at all with
regard to Mother=s other two children.  When asked who she would want to take care of
J.L.W. if he could not be returned to her, Mother replied, A[Aunt].@

Reviewing this and all of the other evidence
presented at trial, we conclude that the trial court could have reasonably
formed a firm belief or conviction that termination of Mother=s
parental rights to J.L.W. was in J.L.W.=s best
interest.  H.R.M., 209 S.W.3d at
108; J.P.B., 180 S.W.3d at 573. 
Therefore, we hold that the evidence is legally and factually sufficient
to support the trial court=s best
interest findings.  We overrule Mother=s second
issue.








IV. Conclusion

Having overruled both of Mother=s
issues, we affirm the trial court=s
judgment.

PER CURIAM

PANEL: MCCOY, GARDNER, and WALKER, JJ.

DELIVERED: November 20, 2008

 

 











[1]See Tex. R. App. P. 47.4.





[2]J.L.W. has West Syndrome,
which involves three separate disorders: seizure disorder, developmental delay,
and mental retardation.  By age four,
J.L.W. could walk, but he could not speak or feed himself, he was not potty-trained,
and he operated at a six-month-old level. 
J.L.W. takes medication and receives physical therapy and speech
therapy.





[3]Mother receives services
from MHMR and Adult Protective Services (APS) from time to time.  She receives SSI because of her
disability.  The MHMR trust fund pays
Mother=s rent, water bill, and
light bill.





[4]J.J.W.=s parental rights to
J.L.W. were also terminated below, but J.J.W. does not appeal.





[5]CPS ruled out an earlier
referral for physical abuse and physical neglect with regard to Mother
appropriately medicating J.L.W.  The
negligent supervision and physical abuse referral involved facts alleging that
P.J. had been tying J.L.W. to the bed with bed sheets and that P.J. was abusing
Mother.  P.J. and Mother informed CPS
that they had just been tucking J.L.W. tightly into bed so that he would not
get up at night.  The caseworker
testified that he advised them that if there was a fire or something, J.L.W. Amight not be able to get
out, he could slip under the covers and suffocate, especially if they were
tight enough to cause bruises on his body.@





[6]Mother=s CPS caseworker noted
that Mother=s APS caseworker advised
him that APS would not assist Mother with housing with P.J. living with her.





[7]Mother works at McDonald=s two days per week.





[8]Mother argues that her
case is distinguishable from J.T.G., in which we upheld a termination on
endangerment grounds when the mother testified that she had been abused by the
fathers of her children and that during one of the altercations, one of the
children had been hurt.  See 121
S.W.3d at 126.  She argues that we also
relied on evidence of the mother=s continued drug use, her emotional instability,
and her suicidal tendencies to uphold the termination, and that, in contrast,
none of this applies in her case.  See
id. at 126B27.  However, the evidence here, while different
from J.T.G., would still allow the factfinder to reasonably form a firm
belief or conviction that a pattern of endangering behavior in an endangering
environment exists.